at all. Council? Your Honour, Richard Burke on behalf of Lewis Age Jr. I will be arguing for all four of the appellants in the case. Council Alison Mills, Autumn Town and Christopher Morrell for each of the co-appellants are present in court and available if the court wishes to ask them any questions. All right. Thank you Your Honour. To borrow from Chief Justice Marshall's famous line from the Burr case, I know not why a man should have a constitutional claim to be confronted with the witnesses against him if the government can come into court with affidavits prepared for trial in lieu of witnesses, out-of-court declarations gathered by a civilian and entrepreneurial prisoner for use in the prosecution. I'm not going to tell you how to do your argument but we've got tons and tons of briefing and you've only reserved 15 minutes so if you're going to tackle these various issues, I suggest you may want to launch in and we've read all the briefing. As voluminous as it is, we're familiar with what transpired so the time may be better spent zooming in on where you think you can make some headway. I don't need to be told twice, Judge. Thank you. My intention is to focus on Claim 1, the 902.11 certificates issue. That is a raise and over claim for this court. We have some adverse authority I have to grapple with from the sister circuits, but beyond that it's our submission. Why do you think that was the worst thing done for the four defendants? Oh, I wouldn't choose it as necessarily the worst thing done, but it was a clear slam-dunk violation of confrontation that led to inadmissible evidence, unconfronted evidence coming before the jury that the government can't hope to show is harmless. If you had another day of the case and brought in people to go, well, here it is, here it is, here it is, how would that have helped you all? If we sent it back, if we affirmed everything else but sent it back on that and had a new trial, how would another day of trial help you with just people marching in and saying, yeah, yeah, yeah? I think your Honour, I've got two responses to that. I want to respond very directly to your question, but I have to preface it first by saying that is absolutely not the harmless error test applicable or the burden on us. Having said that, if I can say that, the idea that authentication and foundational witnesses are some lesser class of witness has never been true, and it's never been less true than today in an age of deep fakes and government reliance on large documentary and electronic dumps of evidence in trials. Often trials turn on whether or not an exhibit that's produced is, in fact, what it claims to be. Here the defendants were denied the opportunity to be confronted by . . . You think it's fake, not just that they left out somebody to come in and go, here it is. You think that person would go, no, no, no. I have no idea. They didn't bring in any witnesses to tell us it wasn't fake. I don't even know if Fred Faulk, the custodian named in the affidavit, exists. The confrontation clause causes witnesses to be brought in. It's not a case where, and again, it's not the proper harmless error test anyway, where it can be assumed that the records were all fine and it's just a technicality. These were records where, for instance, Fred Faulk, the Sprint 2012 that he swore his declarations on in 2019. He didn't express the basis of his knowledge for how he knew about the record keeping. He couldn't identify or didn't identify that the records produced were the records from 2012 that he somehow knew about in 2019. He didn't express any basis for knowledge other than his own assertion of the internal practices and processes. There was a 2013 declaration from, I believe it was the charter records custodian. Well, to Judge Sainz's point, assuming for the sake of argument that we agreed with you, what would that get you in the great ballots of all the issues, the evidence presented, et cetera? A retrial on issue what? The getting us a retrial of which the government would have to prove through live witnesses that the records they're seeking to rely on are indeed the records they claim and that they are reliable and accurate because the custodian's certificates don't simply say this is a copy of the records. They attest to how they were produced, when they were produced, who they were produced or generated by. Beyond the confrontation clause itself, what's the best case you rely on for the context of this trial and the way this evidence was presented? What's the best case that you rely on to support your argument of reversible error? I want to try two, Your Honor, if I can stretch the court. One is the Alvarado-Valdez case out of this court and the Jackson case also, which applied the correct harmless error test for confrontation violations, but also emphasized that when the government relies on the evidence in closing, it can hardly claim to be coming into court and saying that the error was harmless. The second of the cases is the Blake case, a case where this court dealt with a collapse of foundational evidence for phone records, and the assessment of harmless error in that case looked directly to the harm created by the admission of the phone records where the foundation had collapsed. It was a custodian who shouldn't have been allowed to act as the custodian of the business records. So those two cases provide an excellent example of why, as a matter of harmlessness, the error... All right, let me turn to something that's kind of the opposite, and that is having a human come in, and you all objected to the human, which was Crawford. What's your best argument about Crawford? I think our best argument about Crawford comes first directly from the district court judge's error. He applied the wrong test instead of applying the primary purpose test objectively in the circumstances. He defeated our confrontation claim by concluding that because Michael Crawford wasn't a government agent, the statements elicited couldn't be testimonial. The United States Supreme Court had reserved that question in Davis and in Michigan v. Bryant, and in Ohio v. Clark expressly said that it doesn't have to be a government agent. It's more likely to be testimonial if it's a government agent for obvious reasons, but it absolutely does not have to be. So the district court judge directly erred in his ruling and, as a result, failed to go on to make the fact-finding necessary to determine whether an objective observer in the circumstances would have believed that the primary purpose of the conversation with Wilson was to elicit statements for use in a future prosecution. The circumstances in our submission clearly do indicate that. The court in Michigan v. Bryant provided a detailed explanation of how to conduct the objective primary purpose test. We don't look at Crawford's actual intent. We don't look at Wilson's actual intent, but instead we look at the circumstances objectively, which are a federal prisoner with a history of cooperation to get sentencing discounts goes to court, get a sentencing discount, and calls, makes statements that the sentencing discount isn't enough, makes statements that he needs to find someone else for a Rule 35, that he's been promised a Rule 35 if he can come up with something, states he's going to have to find something in the jail, and then, within a matter of days, is communicating to the U.S. Attorney's Office that Wilson has made inculpatory statements to him. In those circumstances, an objective observer aware of those circumstances would have had no doubt that the primary purpose of that conversation was to elicit information Crawford could use to get his Rule 35. So, properly applied, the primary purpose test leads to the conclusion that in this case, in these specific circumstances, because they're an unusual set of circumstances with a lot of information about what was going on, that the primary purpose was gathering the information for use in a prosecution and, therefore, testimonial. In those circumstances, the admission of Crawford's statements about Wilson's out-of-court declarations violated the Confrontation Clause and the government can't possibly hope to establish beyond a reasonable doubt that there was no possibility that evidence contributed to the verdict. I'd like to pivot to what is Claim 4 in the Age Junior Brief, Claim 1 in the Wilson Brief, which is, if we're going to let a witness like Michael Crawford come into court and tell a story about what someone else in the prison supposedly said to him, then it violates the Confrontation Clause to limit counsel in their cross-examination of that detail. The case law already supports the idea that cross on credibility is to be given the largest possible scope and that if there is an area of cross-examination that's not allowed, that the jury could have received a significantly different impression of the witness, then that's a Confrontation Clause violation. That as still applies, we assume that the defense got the full benefit of the cross-examination and the government has to prove harmlessness beyond a reasonable doubt in that context. So what was the error? What's the breadth that was not allowed? The first error was that Crawford got up and lied about three distinct areas, and I'll name them in just one moment. We tried to press him with recorded telephone calls that would have proven to the jury that he had perjured himself, that he had lied to them about whether acting as an informant in more matters than the one he'd already cooperated in, so in this case, was likely to help him get a benefit, whether the seriousness of the case, obviously a very serious case here, would increase his chances of a benefit, and whether at this time around his sentencing and the conversations, he was seeking a reduction and a continuance of his sentencing to get that reduction. Critical points about his motivation in these conversations he claimed to have with Wilson. We had phone calls, recorded phone calls, in which he refuted each of those pro—he claimed in court he didn't think it helped and he wasn't trying to get more benefit. Well, I know you're traversing, you know, whether he should have been credible or not, and I get it, and that's full-throated in the brief, so, you know, we get that part, and I'm not asking you to abandon that, just not use all your time in it, so we get it, you know, you think the jury shouldn't have believed him for all those reasons, blah, blah, blah, the jury got the usual instruction about, you know, witnesses who testifying for the government, yah, yah, yah, judging credibility, et cetera, they got that, but your point when I stopped you before, you were saying the district judge erred because he didn't have the extent of cross-examination. You weren't conceding the point that he should have testified, but your argument, I think, was, but if he did, the judge erred by shortening or shrinking the cross-examination. Is that what you said? Yes, and what he did to—I'm sorry, I didn't get to it sharply enough—what he did was the judge ruled that because Crawford said, I don't remember when we confronted him with the prior inconsistent statements from the phone recordings, we weren't allowed to play those phone recordings, have Crawford identify them, and prove to the jury that he'd made false statements. The judge erroneously thought that if a witness says, I don't remember, then you can't prove the prior inconsistent, and so we were left with the jury with Crawford's statements, and we weren't allowed to present in cross-examination proof that he was lying. All he had to do was say, I don't remember saying that. The jury were instructed that counsel's questions are not evidence, of course, so we had no proof before the jury that he had lied about those things that went to his credibility in this trial. They weren't collateral credibility issues. The second area where the judge erred in our submission was in preventing us from cross-examining Crawford about his belief or expectation that if he changed his story, on our view, told the truth, if he changed his story, he was exposed to prosecution in state court where, because he was an habitual offender, he faced 40 to life. The court concluded that it did not believe the risk of prosecution was sufficiently high that Crawford should be worried about it, but that's not the point, of course. It's whether Crawford was worried about it. It was a factually based line of cross-examination. But I don't understand why the state court is bound by what happens in the federal court in this context. I'm not sure that I follow you, Judge. The dual sovereign, they could have prosecuted him and gotten him life on those heroin charges. I get that, but I don't understand. Your point is that by testifying, he thinks he gets rid of that. How does by testifying in federal court get him rid of that when there's no deal already made on that? Our submission is not that he got rid of it because of a deal. It's that he couldn't afford to come forward and tell the truth now, as some of the other prison informants did. He couldn't afford to do that because he would anger the government and be thrown to the walls. That's the point we wanted to make to the jury. You have to remember that the government's case of informants at Nelson Common collapsed when one of them admitted, actually, I bought this information off someone else. I didn't get it off Wilson. There was what's known as a snitch mill operating out there. Crawford couldn't do what those prisoners did and admit they'd made up their stories about what Wilson said. Crawford had to go through with it or they were going to get him life in state court. That was the concern we believe Crawford, a very savvy operator in this system, had, but we didn't get to tell the jury about that or ask Crawford about that. All right. You've got a red light. You've reserved your rebuttal time to come back up. Thank you very much. Thank you. Will you open the government, Mr. McLaurin? Are you appellate counsel or were you in the trenches with the trial? Appellate counsel, Your Honor, although I will point out that the issue with the jury wheel was an issue that we dealt with as an office, and so I did contribute to that, but I was not part of the trial team. Okay. No worries. Professor Hayden. All right. Good afternoon. May it please the Court. Ryan McLaurin for the United States. I frankly thought that I was going to be spending the lion's share of my time on the intrinsic evidence issue, and so I don't want the Court to think that I'm trying to avoid that, but I do want to respond to some points that were raised by Mr. Burke. After I raise those points, I'd also like to talk, in addition to talking about Crawford, about the testimony by Michael Fizer, Womack's defense attorney, and then obviously if there are any questions that the Court has, I'm happy to answer those as well. Beginning with the 902.11 certificates, frankly, in dealing with the brief and now responding to it at oral argument, it's a little difficult for me to parse both what the problem is with the 902.11 certificates and how it's not directly foreclosed by multiple published cases in this Court, including the case we cite in the brief. It's Ayalotan. It's a published case from 2019. I have the citation for it, if you'd like, but like I said, it's in the brief, that has dealt with this issue over and over again. In the Ayalotan case, it wasn't phone records. It was Google and Yahoo records and documents like that. There are cases that this Court has dealt with, including phone records, and it has squared up with this issue precisely and ruled on it in a way that was difficult to find this evidence in. Aside from that, and this is an issue that you raised, Judge Haynes and also Judge Stewart, is it's difficult to imagine how this could possibly have been a harmful error in this case. The phone records were certainly helpful because they corroborated testimony from the witnesses, but at the end of the day, there were at least three eyewitnesses who testified in this case to very significant interactions that they had with the defendants that, frankly, were more powerful and compelling evidence than the phone records, which were, again, helpful and corroborative, but not sort of the only evidence in this case. There was a testimony from Ayanna Age about how the plan to murder Milton Womack came to be. She was in the room when the plan to murder Milton Womack happened at the Age family house in Slidell. She met with Wilson after the fact, and they had the conversation in City Park about, you know, how did I get in the middle of this, is what Wilson was saying. There was testimony from Raheem Jackson and Brian Maroney, who were the two YMF individuals who were along with Stanton Guillory during the murder, and they testified that they met with Wilson, Ayanna Age III, and then up until— Was there any way for them to find out if the 902.11 was totally fake? Because to me, the notion that we would just add a day, let's assume arguendo, which is not at all necessarily true, if we affirmed everything else, but we reversed on that, sent it back for another trial, adding another day to the trial, just where some people come marching in and go, well, this is it, this is it, this is it, doesn't strike me as particularly helpful to the defendants. So I'm just trying to—but your opponent said, yeah, but we don't know if it's even real. It might be fake. Okay. Well, then it made me wonder, did they have any evidence that it was fake or any indication of that? So I can tell you that the—I agree with you that just having a bunch of records custodians come in and testify for a day and a half, I don't think helps anybody, which is one of the reasons why 90211 was confected in this way, to prevent that sort of problem. But aside from that, the standard practice, at least in the Eastern District, is to provide these sorts of records up front with the—and the standard practice that was followed here, there is—I don't have the record site directly in front of me, but it's there in the record where this was provided. It was obviously litigated pretrial, where the defendants were put on notice that these sorts of records from these companies are coming in. Here are the certificates. And I think at that point, putting the onus on the defendants to go sniff out if anything is wrong with these or suspect with them, at the end of the day, they're just the business records from the records custodians. I suppose you could call AT&T or whatever and try to get to the bottom of it, but I think the whole point of 90211 is supposed to turn this into something that's not just a waste of time, but being kind of this more historic process that's followed in a standard paint-by-numbers way. The other thing that I'd like to point out that really makes this and a lot of the other issues that are raised in this appeal harmless is that there is pretty discreet evidence that really illustrates, and illustrated for the jury, the guilt of these defendants. In particular, there is the recorded jail call between Stanton Guillory and Buddy Lewis, a friend of his from YMF. There are government exhibits 54.3 and 54.4. On those calls, Stanton Guillory, it really encapsulates this case. It's really characteristic of the theory of the case. Stanton Guillory says, Big Lew's got to pay for this, referring to Age III, saying, I expect to get my money that Age III had not paid him yet for doing the murder. Consistent with the government's theory of the case, really kind of locking all of this evidence into place, and it's just one of the examples along with Ayanna Age's testimony and the testimonies of Maroney and Jackson that really knocks the argument that these issues could be harmful. It really knocks a lot of that out. I would like to turn to the issue of Crawford's testimony, the jailhouse informant, and this is another one of those issues where I think the complaints from the defendants don't really ring as the government and the district court somehow did something wrong in this case, but really more of complaints about how this law has evolved and how this body of case law has evolved. There is a robust body of case law with jailhouse informants, both on the investigative end and on the evidentiary and trial management end on how to deal with these types of witnesses, what the government needs to do on the investigative end, how to interact with people who are coming from the jails and saying, I have information to provide to you, and on the district court's end when deciding whether to admit this testimony. It's 50 years' worth of case law. In this case, I would point out that across all of these issues, the district court was very thorough, issued well-researched orders, was very thoughtful about how this evidence came in, and really followed that case law to a T, to the point of Crawford having a pretrial hearing where Crawford testified for two days, was subject to cross-examination by both counsel from Aid for Age Jr. and for Wilson, and testified that he was not a government agent, that the government did not tell him to illicit these statements, testified about the expectation that he hoped to receive at sentencing, and really testified at length as to all of the issues that ultimately have come up in the context of this appeal. The district court's order on that starts at ROA 25330, and specifically on the Messiah claim, starts at 25340, and the district court, again, wrote a thorough order where he credited Crawford's testimony that he was not being sent in as a government agent to get these things. I would also point out that this is yet another example, and that there's a lot of briefing in this case, but this is another one of those issues where the harmlessness argument really is strong. Crawford was not the most important witness in this case. In fact, I would say he's pretty far down the list of important witnesses. He's certainly talked about a lot in these briefs. That's true. And so they seem to think he was pretty critical. I think that aside from Crawford, if you push Crawford aside, you still have, like I said, the recorded jail call between Guillory and Buddy Lewis. You have the testimony of the eyewitnesses. You have the other phone evidence that comes in that really implicates these defendants. You could really take Crawford out of this case, and you'd be left with still a lot of the same overwhelming evidence. And I would think partially that that would come through in our brief, where I think we have two citations to Crawford's testimony, and that they're in string cites, just to kind of corroborate other things that were said at the trial. He just frankly was not that important of a witness in this case. Why did you put him on? Well, it's helpful, but it's just not . . . That's a dangerous why question. But the government has been known to load up before. I don't mean that formally, but by your own words. If you've got them dead to rights, so to speak, with all this other testimony, putting it in there, in the mix, maybe it's false or gumbo, I'm not sure. Maybe you say by homelessness, if error at all, or maybe say by homelessness, but it sends us down this trail of, you know, this case where they seem to say, aha, you know, this is the gotcha that gets us back. Your argument to us, well, he wasn't that important, but as Judge Haines said, when we read the briefs, there's certainly a whole lot in here, you know, that he was put on for. Typically, the government doesn't put on meaningless witnesses. And that's certainly true. I didn't want to give the impression that he was meaningless. He was certainly helpful. But I think just really eclipsed by some of the other witnesses who ultimately testified at the trial, specifically Ayanna Aj, Raheem Jackson, and Brian Maroney were really crucial witnesses here. You know, they were on the scene and witnessed a lot of these conversations and witnessed the murder. You know, obviously with the jailhouse informant, he's coming along after the fact and talking about things that Wilson said to him. So certainly a helpful witness, but at kind of orders of magnitude or in some other tier below some of these other witnesses and the fund records. And did you point out, I think I'm right, I mean, there's just so much here to read, Crawford's testimony was subject to what, promotion limited or some ex parte hearing? There was a pretrial hearing and so . . . So this was teed up before we ever get to the point of his testifying before the jury, right? Yes. He was extensively cross-examined at the pretrial hearing by both counsel 4H Jr. and Wilson. And there were multiple opportunities for the district court to, you know, if it found him not to be credible, to find him not to be credible, he was really sort of poked and probed on all of these points at length. And the district court ultimately found him credible and found this to be admissible. Right. My point being, he was not just sprung on the jury. That's correct. The court and the lawyer said, gone back and forth, presumably with briefings, citations, et cetera, and ultimately the court made a determination he can testify. And that's an issue for us, whether that was legally permissible, but it wasn't that he just . . . nothing happened before he shows up to testify in front of the jury. It was not a day of thing. Obviously, there were things that evolved over the course of his testimony, but he was not a surprise witness. Okay. There is an issue that I'd like to turn to, and in part is because I think it would be an issue of first impression for this court. It's the testimony of Michael Fizer, the Womack's defense attorney. There are some questions of privilege and whether Womack's attorney-client privilege should have prohibited Fizer from testifying about what Womack told him. And I say that it's potentially an issue of first impression. I, during my research in my brief, did not locate a case with a similar factual predicate to this, and so I looked, but I didn't find anything. I think it's important to remember with Fizer's testimony that the government's got 50 tons and gallons of all this evidence, recordings, et cetera, et cetera, on all these guys, yet you want to trot out this first impression issues of Fizer, who's a lawyer for somebody who gets murdered after he's cut a deal. And so that's very atypical in the scenario, so here we are. So, help us understand how, if it maybe doesn't spoil things. Sure, and I think, Judge Stewart, if part of your concern is why call him in the first place, I think I am able to address that and then to talk somewhat about the legal admissibility of his testimony. This was a case where there were so much, there was so much that happened to Womack as part of the legal proceedings before he gets Fizer, and kind of his frustrations with the attorney fazoned. They're actually at the Garcia hearing when he leans over and tugs on the coat of the prosecutor and says, I want to talk to you. I think that aspect of it and the fact that Womack was murdered so close in time to when he got Fizer and was communicating to Fizer, I'm worried for my safety. There's the anecdote that he tells about arriving in Baton Rouge by bus and then walking six feet in front of Fizer because he was worried somebody was watching him. That, I think, was pretty important context to explaining the claims in this case. As to the admissibility of his testimony, I think the thing that's important for purposes of this appeal is that the only issue that was before Judge Ash as the trial judge here was the admissibility of his testimony, not whether the privilege still applied, not the propriety of a witness like Fizer coming forward and speaking about his conversations with Womack. It's one of the phrases that gets used below is that the cat was really out of the bag when it came to the privilege in this case. Mr. Fizer had already gone to Judge Brady in the middle district and gotten an order saying that he could talk about these things. He had already been in debriefing sessions with the government as part of Womack's cooperation where Womack had already said a lot of this stuff that Fizer ultimately testified about. As Judge Ash found in this case, a lot of what Fizer said wasn't privileged anyway because it wasn't made for the purpose of getting facilitating legal advice. It was things like that he was afraid, kind of talking about what his cooperation was like sitting in the room with him, things like that. But then most significantly I think, this is an argument that we raise in our brief, is Age Jr. is trying to vicariously raise somebody else's  There's the body of case law where this court has said that other things similar to this can't be vicariously raised like a Fourth Amendment claim, like a Fifth Amendment claim. And this really is no different from that. Aside from that, there's the policy reason that Age Jr. as the person who's on trial for murdering Womack would be trying to raise his And specifically the perverse incentive that that would create, that flies totally contra to what the forfeiture by wrongdoing exception exists for, that there's this equitable concern with the forfeiture by wrongdoing exception. It would fly totally in the face of that. I have about five, six minutes left. Are you going to talk about why it was necessary to put on this murder of other people? You're talking about the Guillory intrinsic gang-related evidence? Yes. And the murdering these other people. Sure. I can talk about that. Was a big part of what came in, including a five-year-old. Am I remembering right? There was the Breonna Allen murder. That's correct. So I can talk about that. Yeah. So that does seem like something the jury would kind of, huh? And so why put that on? Sure. When it's not directly, it's not like Guillory was running around shooting the five-year-old and the such and such and then Womack. So I do need to, I'm going to talk about the Breonna Allen murder. But before I get to that, I do need to say that most of the other acts or the intrinsic acts that are being raised as part of this appeal were directly tied to this case and the evidence in this case. The carjacking of the Monte Carlo, the theft of the Glock that was ultimately used to kill Womack, the Franklin Avenue shootings where that's how, one of the ways that law enforcement is able to piece the gun back to Guillory is where the same gun is used. As Judge Ash found kind of throughout this case, for example with the Darius shooting is one of the shootings that we identified that's an issue on the appeal. At 5687, he says this puts the Glock in Guillory's hand after the murder. It establishes his possession of the gun in the Monte Carlo and how he came to obtain them shortly before the murder and then how he maintained possession kind of going all the way through the murder. Most of the acts that are raised relate to that. There are two that do not. One is the Breonna Allen murder and the other one is the Kruger murder. Those are the two acts that don't really fall directly into that. As the government argued below and as Judge Ash ultimately found in his intrinsic evidence slash 404 order, that evidence was, he found that it was intrinsic and he was correct because it established why these defendants, why H III and Wilson would have thought to approach Guillory. I think one way to think about this is if you remove this evidence, what this would have looked like to the jury. You have two grown men, one of whom doesn't live and spend most of his time in Central City, approaching an 18-year-old in Central City and saying, can you murder a witness for me? And without that context, it would have been impossible for the jury to understand what was going on. Yeah, but your opponents say that's not really how he was found. He was just more of a volunteer in a pile of people. I think that there is, I understand the disagreement on this. There is some testimony that, and we respond to this in our brief, there's some testimony that H III and Wilson kind of put out feelers kind of with YMF as a group and that they, I think, would have been happy with like a few people. It's not like they had just Guillory that they approached because he was this notorious, singularly notorious hitman. I think YMF being a violent group, there's some testimony that at the body shop and other points in the case, they kind of put out feelers. It was known that they wanted somebody to do this. There's the testimony from Buddy Lewis, for example, where he says, I wasn't going to do it because what, am I going to lock myself into jail? You know, it was sort of this known thing in the ether among YMF. But there's also the testimony from Raheem Jackson and Brian Maroney that there was this conversation at the celebration of life between H III and Wilson and Guillory. There's also other testimony in the case that kind of illustrates this point that the government and the district court relied on, that it mattered that Guillory had developed this reputation. There was testimony, for example, from Buddy Lewis at 5868 testifying that it was well-known in YMF who participated in the Breonna Allen murder. There was testimony from Crawford. This is one of the places where we cited Crawford's testimony, the jailhouse informant, that Wilson told him that he approached Guillory to kill Womack because they were having all kinds of shootouts and building a reputation for themselves. It really, it mattered in this case to explain, again, why these adult men were approaching this 18-year-old to do this. And that's why it was appropriate for it to be admitted as intrinsic evidence. If there are no further questions, I'd ask that you affirm. Thank you. All right. Thank you. All right. Back to you, Mr. Burke. Thank you, Your Honour. Starting at the end there, the intrinsic evidence. It was, by its nature, obviously extremely prejudicial. In a murder trial, to be having all of this evidence about the murders, tainted Guillory and those who were sitting next to him at council table. And it was done under an expansive and erroneous theory of intrinsic evidence that essentially swallows the 404B rule and has been rejected, as we've briefed, by other circuits. And critically, the link the government has tried to make in this argument was not made at trial. The government advertised its intrinsic evidence as proving that this was the reason Guillory was selected and this was why he was approached. But as we've briefed extensively, that's not how the trial evidence played out at all. And the government's theory for why those offences were intrinsic, strained as it was, collapsed. And I have to observe, Your Honours, that the broad liberty given to the government to tell its story and present its case sits fairly poorly alongside the restriction of the defence ability to cross-examine profit. Well, 40B has been there a long time. It's always a delicate balance between its probative worth and the presidential value. I mean, that's quintessential what 404B is, right? And the government wouldn't be putting it in if it wasn't probative in their view. So that's here. The judge here recognized that and was very careful to not move too quickly on this, so counsel got a chance to air this out pretty considerably, seemingly, to me. So I know you disagree with where the judge came out on it, but it's hard to say the judge didn't understand what the deal was, you know, what the 404B implication, particularly not to poison a jury with something that wasn't it. So beyond your factual argument, what is the best case you have that what, here, was not intrinsic evidence but was, in fact, forbidden extrinsic evidence that was camouflaged as intrinsic? Do you understand my question? I hope so. And I think, Your Honor, that the floor, and I'm not complaining Judge Ash didn't give us a hearing. He did. And I believe he did his best to honestly rule on the issue, but in our submission he heard and the floor was in the over-expansion of intrinsic evidence. Well, but stay with my question. I get that. We've got a ton of record. We're going to read it. It's all there. I'm not asking you to re-argue the case. The only way you can win is if we find legal error. I say you. You know what I mean. The only way you can get a reversal, you've got to find that there's legal error, standards review, abuse of discretion, et cetera, et cetera. And I'm just teeing up to say when you're in the 404 balance, it's tedious. The judge carefully goes through. We don't reverse if the judge makes a, quote, erroneous judgment unless it's harmful. And I'm just saying they teed up as intrinsic. I assume your argument is, no, it's not really intrinsic. They camouflaged it to get it before the jury. It should have been excluded as extrinsic. And I am simply asking you, what is the most powerful case, case law you have, this circuit of Supreme Court, that in this context would persuade us to reverse the verdicts in this case? Judge, we have briefed that. I'm going to have to rely on the briefs. I'm not going to be able to conjure up case names from memory. I mean, you know . . . This was my chance. You got it. That's why we give oral argument. I mean, we're going to read the record. But, I mean, this is your shot. If you want us to reverse a week-long jury trial, the judge is going at it. So, I mean, we're going to read the brief. If it's in the brief, there. But just so we don't miss it, this was just your shot at saying, here's where the judge missed it, send it back. Anyway. All right. I absorbed a minute of your time with my question. Madam Clerk, give him an additional minute, because I absorbed a minute with him trying to get my question. All right. You've improved my self-esteem enormously in the process. Stepping further back, then, in rebuttal, the attorney FISA evidence, the point there is reasonable. The point we're making is that the government's test, the test the court applied, in the court below, upends Swidler, the United States Supreme Court, that this is a situation in which the court must recognize the deceased person's privilege, because if it relies upon the attorney or someone else to assert it, it eliminates the privilege in violation of the opposite result to Swidler. Whose privilege do you say it was? Womack's. Unquestionably, Womack's. It was not Attorney FISA's privilege. It was the client's privilege. And... So, he's deceased. So, what happens? So, he's deceased. And in Swidler, the United States Supreme Court said that the privilege survives the death of the client and the attorney does not have the authority to waive the privilege. And so, what the district court judge said was, I'm not saying he's got the authority to waive the privilege, but if he doesn't assert it, I'm letting it in. That's an end run around Swidler. It should not be allowed, and the government's choice to argue it suggests that they like that rule and wouldn't mind trying it again. So, I'd urge the court to address that. I have 27 seconds left and I wanted to make an unpopular point. We chose to argue Claim 1 because understanding that it could be scoffed at as what was the difference. We believed there was a difference. We challenged the accuracy of some of the records at trial. There were entries missing, et cetera. But we win by a direct application of constitutional law, the Supreme Court precedent and this court's precedent. There was no exception for foundational records for business record, foundational witnesses for business records at the time of founding. This business of affidavits for foundational witnesses for business records came in in 2000 under the influence of Ohio versus Roberts. It's a new invention. We used to have to call the witnesses. You've got a red light. I'm going to let you finish your statement. A straight declarative sentence. No commas, no semicolon. Got me? And in those circumstances, unless the government can prove that the phone records did not contribute to the verdict, which they cannot do, we must be granted relief. All right. There might have been a comma and I apologize. All right. You gave it the good college run. All right, Mr. Berg, you are court appointed in this case. On behalf of this panel and our court at large, we excessively appreciate lawyers like yourself who agree to take on difficult cases, court appointed to represent clients and to brief them as well to come in all the arguments. We thank you in this case and in all the other cases that you accept as court appointed counsel. On behalf of myself and my co-appellants, we appreciate that. Thank you. All right. This concludes the argument.